1
2
3
4
5
6
7
8                      UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF WASHINGTON
9                                AT TACOMA
10

RAYMOND T. BALVAGE and
11   DEBORAH A. BALVAGE, husband and
wife; and CHARLES E. WEAVER and          CASE NO. C09-5409BHS
12   SUSAN M. WEAVER, husband and wife,
on their own behalf and on behalf of a
13   class of similarly situated individuals,

                                         ORDER DENYING
14                 Plaintiffs,           DEFENDANT'S MOTION FOR
                                         PARTIAL SUMMARY
15           v.                          JUDGMENT AND GRANTING
                                         IN PART AND DENYING
16   RYDERWOOD IMPROVEMENT AND           IN PART PLAINTIFFS'
SERVICE ASSOCIATION, INC., a             MOTION FOR PARTIAL
17   Washington non-profit corporation,  SUMMARY JUDGMENT

18                 Defendant.

19
         This matter comes before the Court on Defendant Ryderwood Improvement and
20
Services Corporation's ("RISA") Motion for Partial Summary Judgment (Dkt. 25) and
21
Plaintiffs' Motion for Partial Summary Judgment Re: Defendant's Violation of FHA and
22
Non-Compliance with HOPA Exception (Dkt. 14). The Court has considered the
23
pleadings filed in support of and in opposition to the motions and the remainder of the file
24
and hereby denies RISA's motion and grants in part and denies in part Plaintiffs' motion
25
for the reasons stated herein.
26
27
28

ORDER - 1

# I. PROCEDURAL HISTORY

On July 8, 2009, Plaintiffs Raymond and Deborah Balvage and Charles and Susan Weaver filed a complaint against RISA.  Dkt. 1.  On November 10, 2009, Plaintiffs filed an Amended Complaint.  Dkt. 11.  Plaintiffs allege that RISA violated the Federal Fair Housing Act ("FHA"), 42 U.S.C. § 3604(c) *et seq*., committed fraudulent concealment and/or non-disclosure, and violated the Washington Consumer Protection Act, RCW Chapter 19.86.  Dkt. 1, ¶¶ 47–67.

On March 11, 2010, Plaintiffs filed a motion for partial summary judgment.  Dkt. 14.  On March 29, 2010, RISA responded (Dkt. 17), and on April 1, 2010, Plaintiffs replied (Dkt. 20).

On April 1, 2010, RISA filed a motion for partial summary judgment (Dkt. 22), and then on April 5, 2010, filed a corrected version of their motion (Dkt. 25).  On April 26, 2010, Plaintiffs responded (Dkt. 29), and on April 30, 2010, RISA replied (Dkt. 37).

# II. FACTUAL AND STATUTORY HISTORY

## A.    Factual History

Unless otherwise indicated, the following facts are undisputed:

Ryderwood is an area in Cowlitz County, Washington, that currently consists of approximately 270 single family homes.  Dkt. 16, Exh. A at 10.  In 1953, Senior Estates, Inc. platted this area as "Ryderwood No. 1."  Dkt. 24, Exh. A.  The Ryderwood properties were devised by deeds and were subject to identical covenants and restrictions.  *See id*., Exhs. A and B.  RISA submitted as evidence a deed that "accurately reflects the general language and conditions used by Senior Estates to devise properties in Ryderwood."  Dkt. 24 at 2 ¶ 3 & Exh. B.  The deed states that Senior Estates "has acquired and developed the real property known and platted as Ryderwood No. 1 . . . as a community to be occupied by and for the use and benefit of persons who are bona fide recipients of a pension or retirement annuity . . . ."  Dkt. 24, Exh. B at 1.  The deeds also provided Senior Estates with the right to enforce the provisions of the deed as well as transfer its right to enforce

to RISA.  *Id.*  Finally, the deeds provided Senior Estates, and RISA as an assignee, the right to modify or terminate conditions in the deed by recording an instrument in the office of the County Recorder of Cowlitz County, Washington.  *Id.*

In July of 1953, RISA was incorporated.  Dkt. 24, Exh. C.  In 1975, RISA amended its bylaws and recorded them at the office of the County Recorder of Cowlitz County.  *Id.*, Exh. D.  The revised bylaws stated that:

> The qualifications for ownership or purchase of a home within [Ryderwood] are:
> Must be a bona-fide recipient of an annuity or a pension.
> Must not be less than fifty-five years of age
> Must have no additional, permanent occupants of the home, (other than the spouse) who do not meet the above requirements.

*Id.*, Exh. D. at 1.

In a letter dated December 30, 1992, the United States Department of Housing and Urban Development ("HUD") responded to a request from Theda L. Williamson, a RISA board member, for information concerning RISA's qualifications for an exemption from the FHA.  Dkt. 15, Exh. A.  The letter states that if RISA "fails to meet the requirements of the [FHA], any bylaws or deed restrictions which discriminate against persons based on familial status (i.e., presence of children) are unlawful."  *Id.*  Further, the letter advises RISA to consult with an attorney or other person with experience in the area of fair housing to make sure that Ryderwood meets the requirements of the FHA.  *Id.*

In a letter dated July 21, 1993, HUD responded to an additional request from Ms. Williamson regarding the applicability of HUD regulations and the Housing for Older Persons Act ("HOPA") exception.  Dkt. 15, Exh. B.  The letter states that the FHA applies to private housing, regardless of how long such housing has been in existence, and that homeowners associations, and other similar organizations, must adhere to the FHA. *Id.*  Further, in responding to Ms. Williamson's third question of how RISA is affected by someone inheriting property in Ryderwood who is not fifty-five years old, HUD laid out the requirements of the HOPA exception and included with the letter a copy of the regulations that address the issue of housing for older persons.  *Id.*

In a letter dated November 19, 1996, Ms. Williamson wrote to Mr. Swenson, a RISA board of directors candidate. The letter contains HUD regulations relating to housing for older persons including the duties of managers, "in this case our board." Dkt. 15, Exh. C. In the letter, Ms. Williamson adds phrases to the regulations, such as "Our By-laws" and "our board" to show how she interpreted the regulations to apply to RISA. *See* Dkt. 15, Exh. C. At the end of the letter, Ms. Williamson writes:

> Keep in mind that if these regulations are not adhered to, anyone with a grudge against the community, or persons wishing to sell to anyone, can cont[a]ct H.U.D. stating that we do not fulfill the required conditions, and can very likely destroy our retirement community.
> These conditions have not been adhered to by the present board because they assume it isn't in their domain. IF NOT THEM, WHO?

*Id*.

In September of 2005, RISA began conducting a survey to verify the ages of the residents in Ryderwood. Dkt. 16, Exh. A. The survey was completed in April of 2006. *Id*. In a letter dated April 19, 2006, Les Mulkey, a RISA board member, resigned, stating:

> I will always say that I do not agree with having HOPA involved with our corporation. Back in 1993 when our secretary inquired to our Government the board decision was made at that time we were not to be involved with HOPA. I will continue my beliefs but have reluctantly accepted our RISA board decision to follow HOPA.

Dkt. 15, Exh. E. In 2007, RISA conducted a second age verification survey. Dkt. 24, Exh. I. According to RISA, the survey established that Ryderwood had 273 available housing units, twenty-five of which were vacant, and 243 of which were occupied by one person who was at least fifty-five years of age. *Id*. at 1. Plaintiffs dispute the accuracy of the survey results. Dkt. 29 at 5-6.

Currently, RISA continues to take affirmative steps to inform residents, prospective purchasers, and the public at large, that Ryderwood is a community for residents fifty-five years of age and older. Dkt. 24 at 2 ¶ 7. RISA does this by "posting signs throughout the community stating that residency is restricted to those who are '55 and older,' disclosures to real estate agents that work in the area, disclosures to title agencies that contact RISA, and disclosure to prospective purchasers and visitors to

1    Ryderwood." *Id*.  RISA has enforced the restriction against residents under fifty-five

2    years of age for the entire fifty-seven years of Ryderwood's existence.  Dkt. 24 at 2-3.

3    **B.    History of Relevant Statutes and Regulations**

4            The FHA prohibits, among other things, discrimination based on familial status.

5    42 U.S.C. § 3601 et seq.  In 1988, Congress created an exception to the FHA's

6    prohibition that allows communities who meet certain requirements to qualify as housing

7    for older persons and thus discriminate based on familial status.  42 U.S.C. § 3607(b)(1).

8    This exception is commonly referred to as the HOPA.  § 3607(b)(2)(C).  The HOPA

9    states that housing for older persons means, in relevant part, housing that is

> intended and operated for occupancy by persons 55 years of age or older, and--
>> (i) at least 80 percent of the occupied units are occupied by at least one person who is 55 years of age or older;
>> (ii) the housing facility or community publishes and adheres to policies and procedures that demonstrate the intent required under this subparagraph; and
>> (iii) the housing facility or community complies with rules issued by the Secretary for verification of occupancy, which shall--
>> (I) provide for verification by reliable surveys and affidavits; and
>> (II) include examples of the types of policies and procedures relevant to a determination of compliance with the requirement of clause (ii).  Such surveys and affidavits shall be admissible in administrative and judicial proceedings for the purposes of such verification.

*Id*.

        In 1998, amendments were made to the FHA for the purpose of clarifying the

requirements for complying with the HOPA exception.  *See* 24 CFR 100.300 et seq.  The

amendments provided for a one-year transition period during which communities that

sought to be housing for older persons, but were not compliant with HOPA at the time,

could discriminate based on familial status in order to become compliant, as long as the

community

>> (i) Has reserved all unoccupied units for occupancy by at least one person 55 years of age or older until at least 80 percent of the units are occupied by at least once person who is 55 years of age or older; and
>> (ii) Meets the requirements of §§ 100.304, 100.306, and 100.307.

ORDER - 5

§ 100.305(e)(5).  Section 100.304 states what type of housing may qualify for the HOPA

exemption and states a definition for a housing facility or community. Section 100.306

states the requirements for a community to show that it intends to operate as housing for

older persons.  Section 100.307 states the requirements for verification of occupancy:

> (a) In order for a housing facility or community to qualify as housing for persons 55 years of age or older, it must be able to produce, in response to a complaint filed under this title, verification of compliance with § 100.305 through reliable surveys and affidavits.
> (b) A facility or community shall, within 180 days of the effective date of this rule, develop procedures for routinely determining the occupancy of each unit, including the identification of whether at least one occupant of each unit is 55 years of age or older.  Such procedures may be part of a normal leasing or purchasing arrangement.
> (c) The procedures described in paragraph (b) of this section must provide for regular updates, through surveys or other means, of the initial information supplied by the occupants of the housing facility or community.  Such updates must take place at least once every two years. . . .
> (d) Any of the following documents are considered reliable documentation of the age of the occupants of the housing facility or community: (a) Driver's license; (2) Birth certificate; (3) Passport; (4) Immigration card; (5) Military identification; (6) Any other state, local, national, or international official documents containing a birth date of comparable reliability; or (7) A certification in a lease, application, affidavit, ro other document signed by any member of te household age 18 or older asserting that at least one person in the unit is 55 years of age or older.
> (e) A facility or community shall consider any one of the forms of verification identified above as adequate for verification procedures required by this section.
> (f) The housing facility or community must establish and maintain appropriate policies to require that occupants comply with the age verifications procedures required by this section.
> * * *
> (i) A summary of occupancy surveys shall be available for inspection upon reasonable notice and request by any person.

*Id.* Section 100.305 states that the transition period would expire one year from the

effective date of the final regulation.  The effective date of the final regulation was April

2, 1999; thus, the transition period ended on May 3, 2000.  *Id.*

In 2006, HUD issued a memo ("2006 HUD Memo") to all its regional directors to

address the question of whether an existing community may become HOPA compliant

after May 3, 2000, the expiration date of the transition period contained in § 100.305(e).

2006 HUD Memo, Dkt. 16, Exh. D.  The memo states that its purpose is to provide

ORDER - 6

clarification on how communities that did not convert to "housing for older persons" by May 3, 2000, can become housing for older persons. There are two ways to establish housing for older persons after the transition period: conversion and new construction.

First, an existing community or facility can convert to "housing for older persons" if 80 percent of its occupied units become occupied by at least one person 55 years of age or older. Unlike during the transition period, housing providers cannot discriminate against families with children in order to achieve 80 percent occupancy by persons 55 or older. In other words, a community or facility cannot reserve unoccupied units for persons 55 or older, advertise itself as housing for older persons, or evict families with children in order to reach the 80 percent threshold. . . . If the community or facility achieves the 80 percent threshold, ***without discriminating against families with children,*** it may then publish and adhere to policies and procedures that demonstrate an intent to provide housing for persons 55 years or older and comply with verification of occupancy rules.

*Id*. (emphasis in original).

## III. DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

1    The determination of the existence of a material fact is often a close question. The

2    Court must consider the substantive evidentiary burden that the nonmoving party must

3    meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477

4    U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual

5    issues of controversy in favor of the nonmoving party only when the facts specifically

6    attested by that party contradict facts specifically attested by the moving party. The

7    nonmoving party may not merely state that it will discredit the moving party's evidence at

8    trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec.*

9    *Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*). Conclusory, nonspecific

10   statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan*

11   *v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

12   **B.    RISA's Motion for Partial Summary Judgment**

13        **1.    Standing**

14        "In *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982), the Supreme

15   Court reaffirmed that 'Congress intended standing under the FHA to extend to the full

16   limits of Article III and that courts accordingly lack the authority to create prudential

17   barriers to standing in suits brought under that statute.'" *Walker v. City of Lakewood*, 272

18   F.3d 1114, 1123 (9th Cir. 2001) (quoting *Havens*, 455 U.S. at 372 (internal quotation

19   marks omitted)). Accordingly, the sole requirement for standing to bring a suit under the

20   FHA is Article III's "minima of injury in fact: that the plaintiff allege that as a result of

21   the defendant's actions he has suffered a distinct and palpable injury." *Havens*, 455 U.S.

22   at 372 (internal quotation marks omitted).

23        In *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992), the Supreme Court

24   established the three requirements for a party to have standing under Article III:

25        First, the plaintiff must have suffered an injury in fact-an invasion of a
          legally protected interest which is (a) concrete and particularized, and (b)
26        actual or imminent, not conjectural or hypothetical. Second, there must be
          causal connection between the injury and the conduct complained of-the
27        injury has to be fairly traceable to the challenged action of the defendant,
          and not the result of the independent action of some third party not before

28

ORDER - 8

1    the court.  Third, it must be likely, as opposed to merely speculative, that
2    the injury will be redressed by a favorable decision.

3    *Id*. at 560-61 (internal quotation marks and citations omitted).  When the issue of standing

4    is brought up in the form of a motion for summary judgment, a plaintiff may not rest on

5    mere allegations of injury resulting from the defendant's conduct, but must "set forth by

6    affidavit or other evidence specific facts, which for purposes of the summary judgment

7    motion will be taken to be true."  *Lujan*, 504 U.S. at 561 (internal quotation marks and

8    citations omitted).

9        RISA argues that it is entitled to summary judgment on the issue of standing

10   because: (1) Plaintiffs present no proof of any FHA injury; (2) the harms alleged by

11   Plaintiffs have no causal connection to any act prohibited under the FHA; and (3)

12   Plaintiffs cannot show a substantial likelihood that the relief they request will redress the

13   alleged harms.  Dkt 25. at 12-16.  Plaintiffs maintain they have met the three requirements

14   laid out in *Lujan* to have standing under Article III.  Dkt. 29 at 12-15.  In deciding RISA's

15   motion for summary judgment on the issue of standing, the Court takes as true the facts

16   set forth in the evidence by Plaintiffs.  *Lujan*, 504 U.S. at 561.

17       First, Plaintiffs have alleged an "injury in fact" in that they are unable to list their

18   homes for sale to the general public and thus, are unable to sell their homes without

19   complying with a policy they believe to be unlawfully discriminatory.  Dkt. 32, Exhs. A-

20   I; Dkt. 33 at 3-4.  This injury is "concrete and particularized" and "actual and imminent"

21   in that real estate agents refuse to list Plaintiffs' homes for sale to the general public and

22   Plaintiffs do not want to be held responsible for unlawful discrimination for listing their

23   homes as available only to those fifty-five years of age and older.  *Id*.  Further, even if

24   Plaintiffs agreed to the restricted listing, those individuals who wanted to purchase a

25   home in a community exclusively for older persons may hesitate based on the unsettled

26   status of Ryderwood as such a community.  *Id*.  Next, Plaintiffs allege injuries resulting

27   from retaliation by RISA because of their complaints of the alleged unlawful

28   discrimination.  Dkt. 32, Exhs. A-I; Dkt. 33 at 1-3.  Moreover, Plaintiff Weaver has

ORDER - 9

1  alleged an injury in that he was prohibited from allowing his minor son to live with him in

2  Ryderwood.  Dkt. 33 at 3.  All of these injuries are the type of "concrete and

3  particularized" and "actual and imminent" harms that are sufficient to meet the first

4  standing requirement.

5        Second, the injuries alleged by Plaintiffs are causally connected to the prohibited

6  acts of RISA.  Plaintiffs' allegations are that RISA's unlawfully discriminatory policy

7  directly affects their ability to sell their homes and Weaver's ability to have his son live

8  with him.  Dkt. 32, Exhs. A-I; Dkt. 33 at 1-4.  Further, Plaintiffs maintain that RISA,

9  through its members, is responsible for unlawful retaliation against Plaintiffs stemming

10  from their complaints about RISA's discriminatory policy.  Dkt. 32, Exhs. A-I; Dkt. 33 at

11  1-3.

12        Third, the relief sought by Plaintiffs will redress the alleged harms.  Plaintiffs seek

13  damages resulting from RISA's unlawful discrimination, as well as declaratory and

14  injunctive relief to enjoin RISA from discriminating in the future.  Dkt. 1 at 11-17.  If

15  Plaintiffs are successful in proving their claims of discrimination and retaliation and

16  rebutting RISA's affirmative defenses, then the relief they seek may be granted and their

17  harms will be redressed.

18            **2.       Statute of Limitations**

19        "The Supreme Court has held that 'where a plaintiff, pursuant to the Fair Housing

20  Act, challenges not just one incident of conduct violative of the Act, but an unlawful

21  practice that continues into the limitations period, the complaint is timely when it is filed

22  within [the statutory period, running from] the last asserted occurrence of that practice."

23  *Garcia v. Brockway*, 503 R.3d 1092, 1096-97 (9th Cir. 2007) (quoting *Havens*, 455 U.S.

24  at 380-81 (footnote omitted)).  Following the decision in *Havens*, Congress codified this

25  continuing violation doctrine at § 3613(a)(1)(A).  Now, under the FHA, "[a]n aggrieved

26  person may commence a civil action in an appropriate United States district court or State

27

28

1    court not later than 2 years after the occurrence or the termination of an alleged

2    discriminatory housing practice . . . ."  *Id.*

3          Plaintiffs claim injuries resulting from an alleged unlawfully discriminatory

4    housing practice which RISA admits is ongoing.  Dkt. 24 at 2-3.  Although Plaintiffs cite

5    to specific incidents in which they have been injured by RISA's practice, they also allege

6    ongoing injuries caused by RISA's policies and retaliation.  Dkt. 32, Exhs. A-I; Dkt. 33.

7    Thus, the Court concludes that Plaintiffs' claims are not barred by the statute of

8    limitations.  *See* § 3613(a)(1)(A).  Moreover, the specific incidents alleged by Plaintiffs

9    are within the two-year statutory period.  *See id.*  Although Plaintiffs' allegations

10   regarding Weaver's son living with him originated when Weaver moved to Ryderwood in

11   2005, Plaintiffs' position is that RISA continues to not allow Weaver's son to live with

12   him.  Dkt. 33.  Therefore, RISA's motion for summary judgment on this issue is denied.

13         **3.     The HOPA Exception**

14         The FHA prohibits discrimination based on familial status.  Under the HOPA, a

15   community can qualify for an exemption from this prohibition if it meets certain

16   requirements.  42 U.S.C. § 3607(b).  These requirements include: (1) ensuring that eighty

17   percent of the occupied units are occupied by at least one person fifty-five years or older;

18   (2) publishing policies and procedures that demonstrate the community's intent to provide

19   housing for persons fifty-five and older; (3) developing a process to verify the ages of

20   occupants on a regular basis (at least every two years); and (4) maintaining proof of the

21   age verification process and results.  *Id.*; 24 C.F.R. §§ 100.306-100.307.  A community

22   that intended to be housing for older persons but did not meet these requirements by May

23   3, 2000, must cease discriminating on the basis of familial status until all requirements are

24   met.  2006 HUD Memo, Dkt. 16, Exh. D.  If the community seeking HOPA compliance

25   "achieves the 80 percent threshold, *without discriminating against families with children,*

26   it may then publish and adhere to policies and procedures that demonstrate an intent to

27   provide housing for persons 55 years or older and comply with verification of occupancy

28

rules." *Id*. (emphasis in original).  These rules governing verification of occupancy are found at § 100.307 of the regulations and establish very specific things that a community is required to do in order to comply with the HOPA.  § 100.307; *see infra* Section II.B.

"When Congress has 'explicitly left a gap for an agency to fill,' . . . any ensuing regulation is binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute."  *U.S. v. Mead Corp.*, 533 U.S. 218, 227 (2001) (quoting *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843-44 (1984)).  This principle is commonly referred to as *Chevron* deference.  *See generally Mead*, 533 U.S. 218.  Although an agency's internal memorandum is not entitled to "*Chevron* deference," it is entitled to "a measure of deference because it interprets the agencies' own regulatory scheme."  *Coeur Alaska, Inc. v. Southeast Alaska Conservation*, 129 S. Ct. 2458, 2473 (2009) (citing *Auer v. Robbins*, 519 U.S. 452, 461 (1997)).  This "measure of deference" is defined in *Auer*, where the Supreme Court held that an agency's interpretation of its own regulation is controlling unless "plainly erroneous or inconsistent with the regulation."  *Id*. at 461.

Here, RISA is seeking summary judgment on its affirmative defense that it is compliant with the HOPA and therefore entitled to an exemption from the FHA's prohibition of discrimination based on familial status.  Dkt. 25 at 17-24.   RISA admits that it has governed Ryderwood as a retirement community for persons fifty-five and over for over fifty-seven years.  Dkt. 24 at 2-3.  RISA admits that it has limited, and continues to limit, occupants of Ryderwood homes to persons aged fifty-five and over, with the exception of spouses.  *Id*.  Assuming all facts in favor of RISA, the record is clear that RISA did not attempt to comply with the HOPA until at least 2005.  *Id*. at 14.  The 2006 HUD Memo, an internal memorandum issued by HUD to its Regional Directors, interprets the agency's own regulations found at 24 C.F.R. § 100.303 et seq.  Dkt. 16, Exh. D.  The memo is clear that under the regulations, once the transition period ended in May of 2000, any existing community seeking to comply with the HOPA is required to

cease discrimination during the period of gaining compliance.  Dkt. 16, Exh. D.  The

Court finds that this interpretation is neither plainly erroneous nor inconsistent with

HUD's regulations.

In attempting to comply with the HOPA requirements, RISA admits that it has

never ceased discriminating against persons under the age of fifty-five.  *Id*. at 2-5.

Therefore, the Court concludes that RISA is not entitled to summary judgment on its

affirmative defense that it is compliant with the HOPA.

**C.    Plaintiffs' Motion for Partial Summary Judgment**

**1.    Discrimination**

The FHA prohibits discrimination on the basis of familial status.  § 3604(a)-(e).

Section 3602(k) defines familial status as:

> one or more individuals (who have not attained the age of 18 years) being
> domiciled with –
>         (1) a parent or another person having legal custody of such
> individual or individuals; or
>         (2) the designee of such parent or other person having such custody,
> with the written permissions of such parent or other person.

Plaintiffs are seeking summary judgment that RISA unlawfully engaged in

discrimination on the basis of familial status.  Dkt. 14 at 7-8.  First, in their motion for

partial summary judgment, Plaintiffs cite generally to RISA's policy that limits occupants

of Ryderwood homes to those persons fifty-five and over.  *Id*.  In their reply to their own

motion and in their opposition to Defendant's motion for partial summary judgment,

Plaintiffs cite specifically to: (1) their inability to list their homes for sale to the general

public; (2) allegations that RISA retaliated against them for complaining about RISA's

wrongful discrimination; and (3) RISA's alleged prohibition of Weaver's minor son

living with him in Ryderwood.  Dkt. 20 at 8-11; Dkt. 29 at 13-15.

Having reviewed the record submitted in support of these claims and taking the

facts in the light most favorable to RISA, the Court concludes that RISA has failed to

raise a material question of fact as to Plaintiffs' injuries involving the sale of their homes

resulting from RISA's discriminatory policy.

1    Plaintiffs claim injuries resulting from the inability to sell their homes to the

2    general public.  Dkt. 29 at 13-15.  In support of their claims, Plaintiffs submitted

3    declarations in which they explain their attempt to list their homes with local real estate

4    agents and the agents' refusal to list the homes for sale to the general public.  Dkt. 32 at

5    Exhs. A-II.  Plaintiffs argue that RISA's discriminatory policy leaves them in this

6    "conundrum" in which they are forced to choose between complying with a policy they

7    believe to be unlawfully discriminatory or not selling their homes.  Dkt. 29 at 13-14.

8    RISA does not dispute that it enforces a discriminatory policy based on familial status.

9    Dkt. 24 at 2-3; Dkt. 17 at 5.  However, RISA argues in its opposition to Plaintiffs'

10   motion, that Plaintiffs do not have standing to bring their claims based on this

11   discriminatory policy.  Dkt. 17 at 11-16.  As discussed above, the Court concludes that

12   Plaintiffs do have standing to survive summary judgment.  *See supra* Section III.B.1.  In

13   its reply to its own motion for summary judgment, RISA argues that Plaintiffs have no

14   proof of their injuries related to the sale of their homes.  Dkt. 37 at 2.  However, RISA

15   has produced no evidence to support its assertions, and, without more, such assertions are

16   insufficient to defeat Plaintiffs' summary judgment motion.  *T.W. Elec. Serv., Inc.*, 809

17   F.2d at 630 (stating that, for purposes of summary judgment, a nonmoving party may not

18   merely state that it will discredit the moving party's evidence at trial, in the hopes that

19   evidence can be developed at trial to support the claim).

20   Accordingly, Plaintiffs are entitled to summary judgment on their claims resulting

21   from their inability to list their homes for sale to the general public.  The Court concludes

22   that RISA has raised material questions of fact with regard to Plaintiffs' specific

23   allegations of retaliation and discrimination against Weaver based on his inability to live

24   with his son.

25       **2.      The HOPA Exception**

26    As explained above in the section denying summary judgment in favor of RISA

27   on this issue, the Court agrees with Plaintiffs that the 2006 HUD Memo is entitled to

28

ORDER - 14

1   deference in its interpretation of the regulations, the appropriate application of the

2   "transition period," and compliance with the HOPA after such period ended.  *See supra*

3   Section III.B.3.  Therefore, the Court concludes that RISA is not entitled to the HOPA

4   exception because it has not shown compliance with the regulations governing it.  *See id.*

### IV. ORDER

Therefore, it is hereby

**ORDERED** that RISA's motion for partial summary judgment (Dkt. 25) is

**DENIED** and Plaintiffs' motion for partial summary judgment (Dkt. 14) is **GRANTED**

**in part** and **DENIED in part**.

DATED this 4th day of June, 2010.


BENJAMIN H. SETTLE
United States District Judge

ORDER - 15